IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ALMA ROSE PUENTE,                    §
                                     §
         Plaintiff,                  §
                                     §
V.                                   §     CIVIL ACTION NO. H-12-3587
                                     §
CAROLYN W. COLVIN, COMMISSIONER      §
OF THE SOCIAL SECURITY               §
ADMINISTRATION,                      §
                                     §
         Defendant.                  §

## MEMORANDUM AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court[1] in this social security appeal is Defendant's Motion for Summary Judgment

(Document No. 9), and Plaintiff's cross Motion for Summary Judgment (Document No. 10).  After

considering the cross motions for summary judgment, the parties' briefing, the administrative record,

the written decision of the Administrative Law Judge, and the applicable law, the Court ORDERS,

for the reasons set forth below, that Plaintiff's Motion for Summary Judgment is DENIED,

Defendant's Motion for Summary Judgment is GRANTED, and the decision of the Commissioner

is AFFIRMED.

---

[1] On October 1, 2013, pursuant to the parties' consent, this case was transferred by the
District Judge to the undersigned Magistrate Judge for all further proceedings. *See* Document No.
17.

## I.      Introduction

Plaintiff Alma Rose Puente ("Puente") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of an adverse final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for supplemental security income benefits ("SSI"). Puente argues in three points of error that: (1) she is *per se* disabled under Medical Listing 12.05(C); (2) the ALJ failed to properly evaluate her credibility; and (3) the ALJ relied on flawed vocational expert testimony. The Commissioner, in contrast, argues that there is substantial evidence in the record to support the ALJ's decision, and that the decision comports with applicable law.

## II.     Administrative Proceedings

On or about April 28, 2010, Puente applied for SSI, claiming that she has been unable to work since January 1, 2009, as a result of a seizure disorder, anxiety attacks, high blood pressure and high cholesterol, and memory loss. (Tr. 157, 199). The Social Security Administration denied the application at the initial and reconsideration stages. After that, Puente requested a hearing before an ALJ. The Social Security Administration granted her request and the ALJ, Daniel E. Whitney, held a hearing on September 6, 2011, at which Puente's claims were considered *de novo*. (Tr. 30-57). On November 3, 2011, the ALJ issued his decision finding Puente not disabled. (Tr. 12-22).

Puente sought review of the ALJ's adverse decision with the Appeals Council. The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings or

conclusions; or (4) a broad policy issue may affect the public interest.  20 C.F.R.  § 416.1470.  On

October 11, 2012,  the Appeals Council found no basis for review (Tr. 1-3), and the ALJ's decision

thus became final.

Puente filed a timely appeal of the ALJ's decision.  42 U.S.C. § 405(g).  The parties have

filed cross motions for summary judgment (Document Nos. 9 & 10).  The appeal is now ripe for

ruling.


III.     **Standard for Review of Agency Decision**

The court's review of a denial of disability benefits is limited "to determining (1) whether

substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's

decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999).

Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings

of  the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall

be conclusive."  The Act specifically grants the district court the power to enter judgment, upon the

pleadings and transcript, "affirming, modifying, or reversing the decision  of the Commissioner of

Social Security, with or without remanding the cause for a rehearing" when not supported by

substantial evidence. 42 U.S.C.§ 405(g).  While it is incumbent upon the court to examine the record

in its entirety to decide whether the decision is supportable,  *Simmons v. Harris*, 602 F.2d 1233, 1236

(5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor

substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against

the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Jones v.

Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *Cook v. Heckler*, 750 F.2d 391 (5th Cir. 1985).  Conflicts

3

in the evidence are for the Commissioner to resolve.  *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938).  Substantial evidence is "more than a scintilla and less than a preponderance."  *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993).  The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"  *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV.    Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability.  *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988).  The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).  The impairment must be so severe as to limit the claimant in the following manner:

he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the

> immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied to work.

42 U.S.C. § 423(d)(2)(A).  The mere presence of an impairment is not enough to establish that one is suffering from a disability.  Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity."  *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen,* 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

1.  If the claimant is presently working, a finding of "not disabled" must be made;

2.  If the claimant does not have a "severe impairment" or combination of impairments, he will not be found disabled;

3.  If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4.  If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5.  If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience and residual functional capacity, he will be found disabled.

*Anthony,* 954 F.2d at 293; *see also Leggett v. Chater,* 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan,* 925 F.2d 123, 125 (5th Cir. 1991).  Under this framework, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5TH Cir. 2005).  Once the Commissioner shows that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Id.; Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that

the claimant is or is not disabled, the evaluation ends. *Leggett,* 67 F.3d at 563.

Here, the ALJ found at step one that Puente had not engaged in substantial gainful activity since April 28, 2010, the date she filed her SSI application. At step two, the ALJ found that Puente had the following severe impairments: "borderline intellectual functioning, mood disorder, anxiety disorder, and seizure disorder." (Tr. 14). At step three, the ALJ concluded that Puente did not have an impairment or combination of impairments that met or medically equaled a listed impairment, including listing 12.05. The ALJ then, prior to consideration of steps four and five, determined that Puente had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but had the following non-exertional limitations: "avoid hazardous machinery and unprotected heights. There should be no reading for comprehension or math more than simple addition and subtraction. She is able to understand, remember and carry out simple 1, 2, 3 instructions. She is not able to work at production pace rate jobs. She may only work at jobs with infrequent changes in procedures." (Tr. 17). At step four, the ALJ found that Puente had no past relevant work, having not worked at any time for more than a week or so. At step five, using the RFC he found, and relying on the testimony of a vocational expert, the ALJ determined that Puente could perform jobs that exist in significant numbers in the national and regional economy, including laundry worker, kitchen helper, and hospital cleaner, and that she was, therefore, not disabled.

In this appeal, Puente argues that the ALJ erred at step three in failing to find her disabled under Medical Listing 12.05(C), erred in assessing her subjective complaints and her credibility, and erred in relying on the testimony of the vocational expert, which testimony did not take into account Puente's inability to read. In determining whether there is substantial evidence to support the ALJ's decision, including his assessment at step three, the court considers four factors: (1) the objective

medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history and present age. *Wren,* 925 F.2d at 126.

## V.     Discussion

### A.     Objective Medical Evidence

There is very little objective medical evidence in the record.  In addition, of the few treatment/progress notes in the record, most are largely illegible.  What can be gleaned from the medical records is that Puente has a seizure disorder and has been treated intermittently for anxiety/panic attacks.  In addition, in a psychological evaluation conducted in August 2011, Puente was diagnosed with borderline intellectual functioning.

Between August and November 2008, Puente was seen at the Total Medical Care Clinic for anxiety/panic attacks and depression.  (Tr. 282, 284, 285).  She was prescribed Klonopin on August 27, 2008, and was referred to neurology and then later to psychiatry.  Most of these treatment notes are illegible   On April 14, 2009, a psychiatric assessment of Puente was done at the Broadway Medical Clinic. (Tr. 276-279).   At that time, Puente complained of stress and depression.  A mental status examination revealed an affect that was anxious, angry/hostile, depressed, flat and blunted, restless motor activity, and below average intellectual functioning.  Puente, however, was also alert, oriented to person, time and place, had some insight, and reasonable judgment.  (Tr. 278).  Puente

was diagnosed with a panic disorder, assessed a GAF of 50-60,[2] and prescribed Klonopin, Paxil, Buspar and Depakote.

Thereafter, there are no treatment or progress notes in the record until July 7, 2010, when Puente was next seen by Cecilia P. Lonnecker, Ph.D. for a mental status evaluation. (Tr. 300-304). At that time, Puente reported to Dr. Lonnecker that she had a history of epileptic seizures and anxiety, had been in treatment for nine years, had last had a seizure two years ago, and was currently taking Clonazepam but had not been taking Depakote due to cost issues. Upon mental status examination, Puente's speech was understandable, but mildly pressured, her thought processes were coherent, she had no delusions or suicidal ideations, her mood was anxious, she was fully oriented to person, time and place, and she had below average intelligence. She was diagnosed with an anxiety disorder "NOS," and a conduct disorder by history, and was assessed a GAF of 50.

Ten days later, on July 17, 2010, Puente was seen in the emergency room at the Memorial Hermann Emergency Center, after having had a seizure. (Tr. 308). She reported that she had not taken her medication in 3-5 days. (Tr. 308) Her CT scan was negative, as was her neurological examination. (Tr. 308). She was released to home in stable condition in the early morning hours

---

[2] The Global Assessment of Functioning ("GAF") is a measurement "with respect only to psychological, social and occupational functioning." *Boyd v. Apfel*, 239 F.3d 698, 708 (5th Cir. 2001) (citing DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 4th Edition (DSM-IV), at 32). A GAF of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 4th Edition, Text Revision (DSM-IV-TR), at 34. A GAF of 41-50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessive rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* A GAF of 31-40 denotes "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood." *Id.*

of July 18, 2010 (Tr. 311-318).  Thereafter, she was seen by Dr. Steven Goldstein, who re-started her on Depakote, after noting that her seizures had previously been controlled with Depakote.  (Tr. 370).  An EEG was, at that time, normal.  (Tr. 371)  Puente was seen by Dr. Goldstein on only this one occasion.

Thereafter, she was seen by Dr. Olajda Masha on January 10, 2011, March 9, 2011, and May 8, 2011 (Tr. 404-409).[3]  On her initial visit with Dr. Masha on January 10, 2011, Puente, who had been referred for counseling, reported sleeplessness through day, mood swings, racing thoughts, depressed mood, frequent physical fights with friends, "wandering off" behaviors, and some amnesia. Puente also reported that she had been hospitalized for a panic attack on December 1, 2010.  (Tr. 406).  Upon mental status examination, Dr. Masha found Puente's motor activity to be restless, she had a depressed mood and an affect that was not congruent to her mood, her speech was pressured and emotional, her thought processes were goal directed, she had no suicidal or homicidal ideations and no hallucinations, she was oriented to person, place, time, and situation, she was alert, her judgment was poor, and her insight was fair.  (Tr. 407-408).  Dr. Masha diagnosed Puente with "bipolar I" disorder with psychotic features, and depression, assessed her a GAF of 40, started her on Seroquel and Flouxetine, and recommended individual psychotherapy.  (Tr. 408-409).  On follow-up with Dr. Masha on March 9, 2011, Puente reported moderate symptom improvement with improved mood, and significantly improved sleep.  (Tr. 405).  Puente continued to deny suicidal and homicidal ideations, and reported improved seizure control with Depakote and Klonopin.  (Tr. 405).

_____

[3] Dr. Masha's treatment notes were not provided to the ALJ, but were submitted to the Appeals Council.  (Tr. 403).  The Order of the Appeals Council indicated that Dr. Masha's treatment notes were considered, but did "not provide a basis for changing the Administrative Law Judge's decision."  (Tr. 1-2).

A mental status examination revealed normal motor activity, Puente was oriented x3, her mood was euthymic, and her memory, eye contact and concentration were found to be good.  (Tr. 405).  Dr. Masha assessed an improved GAF of 50, and continued Puente on both Seroquel and Flouxetine. (Tr. 405).  Two months later, on May 8, 2011, Puente reported that her mood had been "okay," that she gets moody every now and then, and that she has been sleeping too much.  (Tr. 404).  A mental status examination revealed normal motor activity, Puente was alert and oriented x3, her affect was appropriate, her mood was "not good," her eye contact and memory were good, and there were no suicidal ideations, homicidal ideations, or hallucinations.  (Tr. 404).  Dr. Masha reiterated her diagnosis of bipolar disorder with psychotic features and  depression, assessed Puente a GAF of 50, and continued her on Seroquel and Flouxetine.  (Tr. 404).

On August 8, 2011, Puente underwent a comprehensive consultative psychological evaluation with Andrea Pellegrini, Psy.D. (Tr. 383-399).  By history, Puente reported that she suffers from a seizure disorder that began when she was eighteen, that she has both short-tem and long-term memory loss as a result of the seizures, that she has feelings of anxiety and experiences panic attacks when she is angry, which are accompanied by shortness of breath, fidgetiness, nausea, nervousness, cold sweats and a rapid heartbeat, and that she has "additional symptoms of anger, being easily irritated, elevated sadness, lack of energy, aggression, impulsive behavior and helplessness."  (Tr. 384).  She also reported that she takes Depakote for her seizures and Flouxetine and Seroquel for her panic attacks and anxiety, but has not taken any "psychotropic medication for the last two months." (Tr. 384).  As for her functional limitations, Puente reported that "her symptoms hinder her ability to complete tasks on time," "she has problems focusing and concentrating," and she "also has problems remembering things."  (Tr. 385).   Upon mental status examination, Dr. Pellegrini noted

that Puente's "eye contact was sustained," "rapport was easily established," "[n]o significant deficits in expressive or receptive language ability were noted, although these were not formally evaluated," "[h]er speech rate and tone were within normal limits," "[s]he appeared mildly anxious and could become fidgety," and "[s]he appeared to put forth good effort during testing . . . rendering valid results." (Tr. 385). Puente was oriented to "place, person, situation, and to time," her "immediate memory functions appeared intact with weaker shorter-term memory functions," her "concentration and attention appeared inadequate," her "mood appeared mildly anxious with a normal range affect," she "denied and exhibited no overt signs of delusions, hallucinations or the presence of a thought disorder. . . . She demonstrated goal oriented thinking. She denied any present suicidal or homicidal ideations," her "[t]hought content appeared limited but appropriate to the situation," and her "insight and judgment appeared limited." (Tr. 385-386). IQ testing revealed "general cognitive ability [ ] in the Extremely Low range of intellectual functioning" with a verbal IQ of 66, a performance IQ of 70 and a full scale IQ of 65. (Tr. 386-388). WRAT 4 testing of Puente's "basic academic skills of word reading, sentence comprehension, spelling and math computation" revealed a 5th grade level of word reading, a fourth grade level of sentence comprehension, a less than fourth grade level of spelling, and a sixth grade level of math computation. (Tr. 389). Dr. Pellegrini noted that while Puente's testing results were "typically indicative of a possible diagnosis of Mild Intellectual Disability, Borderline Intellectual Functioning was given [as a diagnosis] due to the probable effects her seizure disorder likely has on her cognitive abilities." (Tr. 389). Dr. Pellegrini also diagnosed Puente with a "mood disorder not otherwise specified" and a "panic disorder without agoraphobia," and assessed her a current GAF at 54. (Tr. 390). Dr. Pellegrini notes that concluded that Puente's prognosis was guarded, but "with consistent and effective mental health and continued medical

treatment, her prognosis may improve." (Tr. 390).

The objective medical evidence in the record, from the sparse treatment notes, and two consultative mental/psychological evaluations, shows that Puente has a seizure disorder, that is generally controlled with medication, an anxiety disorder, that has only been intermittently treated, and borderline intellectual functioning. There is also some indication that Puente may have a bipolar disorder. None of the objective medical evidence, however, suggests that Puente is unable to engage in all types of gainful work activities. In addition, the objective medical evidence in the record supports the ALJ's conclusion that Puente did not meet or equal the requirements of Listing 12.05.

Listing 12.05, as it was at the time of the ALJ's decision, provided for presumptive disability as follows:[4]

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> Or
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> Or

---

[4] Listing 12.05 has, as of February 2014, been changed from "Mental Retardation" to "Intellectual Disability." The substantive criteria for that Listing, however, remain the same.

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Or

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

20 CFR Pt. 404, Subpt. P, App. 1 (effective June 7, 2011 to June 12, 2012). Disability under Listing 12.05 requires not only that the criteria in paragraphs A, B, C or D be met, but that there be "an independent showing of 'significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; that is to say, the evidence demonstrates or supports onset of the impairment before age 22.'" *Randall v. Astrue*, 570 F.3d 651, 659-660 (5th Cir. 2009). In other words, meeting the A, B, C, or D criteria alone is insufficient for presumptive disability under Listing 12.05. *Id.*

Here, Puente maintains that she meets the criteria of Listing 12.05(C) because her full scale IQ is 65, and she has both physical and mental impairments (seizure disorder and panic disorder), which impose significant additional limitations on her ability to do work related activities. The Commissioner, in response to Puente's argument that she meets Listing 12.05(C), points out that while Puente does have IQ scores that fall within the "C" criteria and does have other physical and mental impairments, she has made no showing, and there is no evidence in the record, that she had

13

"significantly subaverage general intellectual functioning with deficits in adaptive functioning [that] initially manifested" before age 22.   The ALJ, in considering Listing 12.05(C), did not discuss its application with any specificity and instead relied upon the absence of any evidence that Puente's intellectual functioning impairment initially manifested itself before age 22.   In doing so, the ALJ wrote:

> Finally, the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.   There is no evidence that demonstrates or support[s] onset of the impairment before age 22.

(Tr. 17).   That determination by the ALJ – that there was "no evidence that demonstrates or support[s] onset of the impairment before age 22" – is supported by the record.

At the hearing before the ALJ, the ALJ questioned Puente about her performance in school and the grades she completed.   Puente could not provide any definitive testimony about her schooling, responding on several occasions to the ALJ's questioning that she didn't remember.   (Tr. 35-36).   That lack of information from Puente herself prompted the ALJ to inquire about the existence of school records, and led him to hold the record open for Puente's counsel to obtain any such records.   In so doing, both the ALJ and Puente's attorney recognized the importance of Puente's school records:

> ALJ:    All right, we don't have any school records, Mr. Bringus?
>
> ATTY: No, your honor, and we're trying to get them.  I'm hoping that they did some kind of psychological testing when she was in school, but she –
>
> ALJ:    When do we think we're going to get them?
>
> ATTY: I was hoping to have them by now, your honor.

ALJ:    Okay.  Well, I mean –

ATTY: The problem –

ALJ:     – do you need me to hold the record open to receive those?

ATTY: If you would, for two weeks –

ALJ:    Two weeks.

ATTY: I would appreciate it.

ALJ:    All right.

ATTY: Because, frankly, it – I'm starting to think we may never be able to come up with them.

ALJ:    Well –

ATTY: We don't have, exactly, the best historians and the mother is not exactly the best historian either.  I think it's a pattern within the family.

ALJ:    Okay.  Well, I'll hold the record open two weeks for you.

(Tr. 50).[5]  Based on counsel's subsequent requests, the record was further held open until November 1, 2011 (Tr, 267-270), but no substantive school records were ever provided.  (Tr. 271-272).

Puente now argues in this appeal that it is not important that she was unable to provide any school records which evidenced her Listing 12.05 impairment before the age of 22, because the IQ testing in August 2011, when she was 27 years old, is presumed to be the same as her IQ prior to age 22.  In support of that proposition, Puente cites to *Santiago v. Astrue*, 2008 WL 2405728 (W.D.N.Y. 2008) and *Vasquez-Ortiz v. Apfel*, 48 F.Supp.2d 250, 257 (W.D.N.Y. 1999).  Such a presumption has not been explicitly recognized by the Fifth Circuit Court of Appeals in the social security

---

[5] At the conclusion of the hearing, Puente's counsel essentially conceded that there was no evidence of any psychological testing of Puente prior to age 22  (Tr. 55), to which the ALJ responded that "that's . . . why I was interested to see if we had any . . . school records." (Tr. 55-56).

15

context.  *See Pritchett v. Commissioner*, No. 3:11-CV-00309-BF, 2012 WL 1058123 *8 (N.D. Tex. March 29, 2012).  But,  even if such a presumption were to be recognized, the results of Puente's IQ tests, standing alone, do not evidence that Puente, prior to age 22, had "significantly subaverage general intellectual functioning *with deficits in adaptive functioning*."  *See e.g., Parker v. Astrue*, Civil Action No. 11-294-SCR, 2012 WL 5384821 *4 (M.D. La. Nov. 1, 2012) ("the mere existence of IQ scores which satisfy the first part of paragraph C, along with a limited or special education" are insufficient, in and of themselves, to "demonstrate[ ] deficiencies in adaptive functioning initially manifested during the developmental period, that is, onset of the impairment before age 22"); *Potts v. Astrue*, Civil Action No. H-12-cv-229, 2013 WL 5785659 *8 (S.D. Tex. Feb. 19, 2013) (claimant's "poor performance in school, his past history as a special education student, and his illiteracy" are insufficient to meet the his burden of establishing a "deficit in adaptive functioning" as required by Listing 12.05(C)).  While Puente testified at the hearing that she was in "special classes" in elementary school, she could not provide any information about the type of classes she was in after elementary school:

> Q:     But when you got up higher than elementary, you weren't in special classes?

> A:     Well, I don't remember really, like, when –

(Tr. 36).  Moreover, in completing Disability Report Form SSA-3368, Puente reported that she went to school through the tenth grade, and had *not* been in any special education classes.  (Tr. 200). Finally, the only IQ testing in the record was done in connection with a consultative psychological evaluation in August 2011, and while Puente's full IQ was found to be 65, Dr. Pellegrini could not conclude from those results that Puente had Mild Intellectual Disability, and instead diagnosed her with Borderline Intellectual Functioning "due to the probable effects her seizure disorder likely has

16

on her overall cognitive abilities." (Tr. 389).  The record supports the ALJ determination that there is "no evidence that demonstrates or support[s] onset of the impairment before age 22." *See e.g., Bailey v. Colvin*, No. 3:12-CV-1800-N (BH), 2013 WL 5299285 * 10 (N.D. Tex. Sept. 20, 2013) (affirming decision of Commissioner and finding substantial evidence to support the ALJ's decision that claimant had not met his burden to show his impairment met Listing 12.05).

Accordingly, because it was Puente's burden to show that she met Listing 12.05(c), *Perez*, 415 F.3d at 461; *Selders*, 914 F.3d at 619, and because there is, as found by the ALJ, no evidence, objective or otherwise, that Puente had "significantly subaverage general intellectual functioning *with deficits in adaptive functioning*" prior to age 22, the objective medical evidence factor supports the ALJ's decision.

## B.    Diagnosis and Expert Opinions

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Schweiker,* 653 F.2d 997, 1001 (5th Cir. 1981); *see also Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses should be accorded great weight in determining disability."). In addition, a specialist's opinion is generally to be accorded more weight than a non-specialist's opinion.  *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).  For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings.  *Scott v. Heckler*,

17

770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078 (5th Cir. 1981).  Further, regardless of the opinions and diagnoses and medical sources, "'the ALJ has sole responsibility for determining a claimant's disability status.'" *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (quoting *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).

There are no expert medical opinions in the record that Puente meets a Listing, or is otherwise unable to engage in substantial gainful activity; in fact, all the expert medical opinions in the record are to the contrary.  Dr. Lonnecker did not assess or opine about Puente's ability to engage in work related activities, but Dr. Pellegrini did.  In a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" (Tr. 400-402), Dr. Pellegrini opined that Puente had no restrictions in her ability to understand and remember simple instructions and no restrictions in her ability to carry out simple instructions.   It was only Puente's ability to understand, remember and carry out complex instructions or make judgments on complex work-related decisions that were moderately or markedly limited.  With respect to her ability to interact appropriately with the public, Dr. Pellegrini found Puente to have only mild restrictions; in her ability to interact appropriately with supervisors and co-workers, Dr. Pellegrini found Puente to have moderate restrictions; and in her ability to respond appropriately to usual work situations and to changes in a routine work setting, Dr. Pellegrini found Puente to have marked restrictions.  These opinions of Dr. Pellegrini are consistent with the ALJ's RFC, which limited Puente to jobs that (1) required "no reading for comprehension or math more than simple addition and subtraction"; (2) only required the ability "to understand, remember and carry out simple 1, 2, 3 instructions"; (3) did not require "work at production pace rate jobs"; and (4) did not involve frequent changes in procedures.  (Tr. 17).  That RFC is also generally consistent with the opinions of Dr. Thomas Geary, Ph.D. (Tr. 352-369), who reviewed Puente's

medical records, completed both a psychiatric review technique form and a mental residual functional capacity assessment, and concluded that Puente could "understand, remember and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods and respond appropriately to changes in routine work settings." (Tr. 368)

Because the only expert medical opinions in the record about Puente's abilities to engage in work related activities are consistent with the ALJ's RFC, the expert medical opinion factor fully supports both the ALJ's RFC determination, and his conclusion that Puente can engage in work related activities.

### C.    Subjective Evidence of Pain and Disability

The third element considered is the subjective evidence of pain and disability, including the claimant's testimony and corroboration by family and friends. Not all pain and subjective symptoms are disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook,* 750 F.2d at 395. In an appeal of a denial of benefits, the Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has the opportunity to observe the claimant. *Hames v. Heckler,* 707 F.2d 162, 166 (5th Cir. 1983).

Puente testified at the hearing before the ALJ that she has been unable to maintain employment in the past because she has "problems remembering," she can read and write only a "little bit," she no longer drives because of her seizure disorder, she tends to get mad for no reason, she doesn't have seizures when she's taking her medication, but sometimes forgets to take her medication, her medications make her dizzy and sleepy, she doesn't go anywhere alone, and she sometimes washes dishes and mops the floor, but it's too much to wash "clothes and stuff." (Tr. 34,

36, 41, 45-49).  She also stated, in response to questions posed by the ALJ, that she did not remember if she had just stopped working at Papa's Barbeque or had been fired, did not remember if she was in special classes after elementary school, did not remember why she stopped going to school, did not know if she had received social security benefits as a child, and did not remember when she last had a seizure (Tr. 34, 36, 39, 45).

In concluding that Puente's subjective complaints were not credible to the extent she testified to, the ALJ first described all of the medical evidence in the record and determined that "there is no objective medical evidence to show that the severity [of her symptoms] would prevent her from doing a job that would follow the above outlined residual functional capacity."  (Tr. 20).  The ALJ then, without making any specific assessment of any of Puente's subjective complaints, concluded that "[t]o the extent they are credible the claimant's subjective allegations have been considered and incorporated into the above residual functional capacity.  The assessment of the functional capacity gives the greatest weight to her allegations."  (Tr. 20).

The ALJ's assessment of Puente's credibility is, as argued by Puente, vague and does not contain any reasons why the ALJ found Puente's subjective complaints not fully credible.  However, the ALJ's credibility assessment does not provide a basis for remand because the ALJ credited Puente's subjective complaints and developed an RFC that was consistent therewith.  As set forth above, Puente testified that the primary reason she is unable to work is because she has "problems remembering stuff."  In addition, Puente testified that has a limited ability to read and write, she cannot drive, she has anger and anxiety issues, and does not go anywhere alone.  She also testified, however, that she doesn't have seizures when she's taking her medication, and she can wash the dishes and mop the floor.  She also reported in a daily activity questionnaire that she takes care of

her eight year old child, she is able to prepare simple meals, she cleans the house, watches television and walks a lot.  (Tr. 207-213).  The ALJ's RFC, which limited Puente to not working with hazardous machinery and at unprotected heights, to only simple addition and subtraction and no reading for comprehension, to only "simple 1, 2, 3 instructions," to work not at a production pace rate, and to jobs with "infrequent changes in procedures," generally took each of Puente's subjective complaints into account.  Thus, while the ALJ should have clearly articulated what subjective complaints he found credible and to what extent, *see* Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996), his failure to do so was harmless given that the RFC he found was generally consistent with those subjective complaints.  *Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012) (An error is harmless if it does not "affect the substantial rights of a party"); *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003) ( An error is harmless when it "is inconceivable that the ALJ would have reached a different conclusion" absent the error) *Bornette v. Barnhart*, 466 F.Supp.2d 811, 816 (E.D. Tex. 2006) ("Harmless error exits when it is inconceivable that a different administrative conclusion would have been reached absent the error."). The subjective complaints factor therefore also supports the ALJ's decision.

### D.  Education, Work History and Age

The fourth element considered is the claimant's educational background, work history and present age.  A claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(a).

Here, at the time of the administrative hearing before the ALJ, Puente was 27 years old, she

was determined to have a limited education and an ability to communicate in English, and had no

past relevant work.  Taking this vocational information, the ALJ questioned the vocational expert

as follows about whether a person of Puente's age, education, past work experience, and RFC could

perform any jobs that exist in significant numbers in the regional and national economy:

> Q:     Ms. Repant, for all hypotheticals, assume a person of the same age,
> education, and work history as the claimant.  Assume a person – no
> exertional limitations, limited to – able to understand, remember, and carry
> out simple, one, two, three instructions, make simple one, two, three work
> related decisions, no reading for comprehension or math more than simple
> addition and subtraction, not able to work at production rate paced jobs, or
> with jobs with – infrequently – or with – able to work a job with infrequent
> changing work [INAUDIBLE] requirements.  Now, based on these
> limitations, would there be jobs available in the regional or national
> economy?

> A:     Yes, your honor.  There'd be medium, unskilled work.  An example would
> be a laundry worker and that's DOT 37 – excuse me – 361.687-018.  There's
> approximately 1,200 in the Houston metropolitan area and 240,000 in the
> national economy.  A second example would be a kitchen helper and that's
> DOT 317.684-010 and there's approximately 1,400 in the area and 275,000
> in the national economy.  A third example would be a hospital cleaner and
> that's DOT 323.687-010 and there's approximately 900 in the area and
> 195,000 in the national economy.

(Tr. 51-52).

"A vocational expert is called to testify because of his familiarity with job requirements and

working conditions.  'The value of a vocational expert is that he is familiar with the specific

requirements of a particular occupation, including working conditions and the attributes and skills

needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d

1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a

properly phrased hypothetical question, constitutes substantial evidence.  *Bowling v. Shalala*, 36 F.3d

431, 436 (5th Cir. 1994).  This is particularly true when the vocational expert's testimony is consistent with the information in the Dictionary of Occupational Titles (DOT). *See generally Carey v. Apfel*, 230 F.3d 131, 147 (5th Cir. 2000) ("the probative value and reliability of the [vocational] expert's testimony" can be called into question if it conflicts with the information contained in the DOT).

Puente maintains in this appeal that the vocational expert's testimony does not constitute substantial evidence that supports the ALJ's decision because there was no evidence from the vocational expert, or any other source, that Puente "has the capacity to read at a level sufficient to perform" the jobs identified by the vocational expert.  In particular, Puente argues that there is no evidence that she has the ability to read the safety and hazard information related to the products she may be required to use to perform the jobs identified by the vocational expert.  Puente's attorney questioned the vocational expert in this regard as follows:

> Q:   Ms. Repant, these jobs all require reading according to the DOT and its accompanying publication, the Professional Characteristics of Occupations, don't they?
>
> A:   Yes.
>
> Q:   What kind of vocabulary is required in terms of reading, if you know, for laundry worker?
>
> A:   The laundry worker's a – the language is a one and I think that's having – able to – being able to read to – 500 to 1,000 words.
>
> Q:   And kitchen helper?
>
> A:   Kitchen helper is also a one, and a hospital cleaner is a two.
>
> Q:   Okay.  Now, do you have any idea of how these classifications, one, one, two, how they correlate to grade equivalents?

A:     No, there's no correlation to grade equivalents.

Q:     Now, hospital cleaners, are they required to be able to at least read safety and hazard information?

A:     They have to be able to read to know what chemicals they're using, but I'm not sure what you mean by safety and hazard information, like, a manual? No.

Q:     No, I don't mean a manual, but read, like, safety labels and read the –

ALJ:     Like on – like on cleaning products, that sort of thing?

Q:     Not only cleaning products, they dispose of waste, don't they?

ALJ:     Oh.

A:     Yes, they'd have to know which waste goes where.  There's different waste–

Q:     There's different processes for different types of waste?

A:     Well, yes.

Q:     And kitchen helpers have to at least be able to read sufficiently to be able to read the safety and hazard as it – the warning, the hazard warnings, in the job site, correct?

A:     That's correct.

Q:     And laundry worker's the same thing, correct?

A:     Correct.

Q:     In fact, there would – there would be, like OSHA posters and things like that, correct?

A:     Correct.

Q:     Now – and again, you don't know what grade level these posters and these materials are prepared, do you?

A:     No.

24

(Tr. 52-54).

In a step five disability determination case, it is the Commissioner's burden to prove that there are jobs existing in significant numbers in the national and regional economy that a claimant can perform.  *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).  Here, despite Puente's contentions that she does not have the ability to read safety and hazard information, the record contains substantial evidence that Puente can perform jobs such as laundry worker, kitchen helper and hospital cleaner.  The evidence in the record is that Puente can read at a fifth grade level, and was at one time able to pass a written drivers' test.  There is also evidence that a laundry worker and a kitchen helper only require a reading level of one ("Recognize meaning of 2,500 (two- or three-syllable) words. Read at rate of 95-120 words per minute.  Compare similarities and differences between words and between series of numbers."), and a hospital cleaner requires a reading level of two ("Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.").   In contrast, it is a reading level of three under the DOT that requires the ability to "[r]ead a variety of novels, magazines, atlases, and encyclopedias. *Read safety rules, instructions* in the use and maintenance of shop tools and equipment, and methods and procedures in mechanical drawing and layout work.").  As such, the vocational expert's testimony, coupled with the DOT's reading level criteria and Puente's grade level reading equivalency, constitutes substantial evidence that satisfies the Commissioner's burden at step five.

Puente's contention that she may not be able to read safety and hazard warnings can only be viewed as an attempt by Puente to rebut the Commissioner's step five finding.  But to rebut a step

25

five finding, a claimant must offer evidence that she cannot perform the type of work identified by the vocational expert and ALJ.  Puente has not done that here; all she has done is question whether the jobs identified by the vocational expert and the ALJ require her to read safety and hazard information that is beyond her reading abilities.  Such questioning, or speculation, is insufficient to rebut the step five showing.  The vocational expert's testimony, and the vocational criteria factor in this case therefore support the ALJ's decision at step five.

## VI.    Conclusion and Order

Based on the forgoing, and the conclusion that there is substantial evidence in the record to support the ALJ's determination at step five, and that any error by the ALJ in assessing Puente's subjective complaints and credibility was harmless, it is

ORDERED that Defendant's Motion for Summary Judgment (Document No. 9) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 10) is DENIED, and the Commissioner's decision is AFFIRMED.

Signed at Houston, Texas, this 19th  day of March, 2014.


Frances H. Stacy
United States Magistrate Judge